UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————

DAIKWAN GILES,

*Petitioner*,

*v.*

AMY LAMANNA, SUPERINTENDENT,
FIVE POINTS CORRECTIONAL FACILITY,

*Respondent.*

————————————

## MEMORANDUM OF LAW IN SUPPORT OF VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2254)

Robert S. Dean
Center for Appellate Litigation
*Attorney for Petitioner*
Matthew Bova, *Of Counsel*
120 Wall Street, 28th Floor
New York, NY 10005
mbova@cfal.org

July 7, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

INTRODUCTION ................................................................................................................... 2

STATEMENT OF THE CASE ................................................................................................ 3

The Doctored Police Report .................................................................................................. 3

Trial Evidence ........................................................................................................................ 6

Summation ........................................................................................................................... 16

Verdict and Sentence ........................................................................................................... 21

Codefendant's Motion to Vacate the Conviction ................................................................ 21

Mejia's Account Surfaces .................................................................................................... 22

The State Discloses that the Mejia DD5 Was Doctored ..................................................... 22

The C.P.L. § 440.10 Litigation ........................................................................................... 23

The 440 Decision ................................................................................................................. 24

Direct Appeal ....................................................................................................................... 25

ARGUMENT ....................................................................................................................... 27

POINT I. The Post-Conviction Court's Decision Rejecting Mr. Giles' *Brady* Claim
Involved an Unreasonable Application of, and Was Contrary To, Clearly-
Established Law. .................................................................................................................. 27

POINT II. The Prosecutor's Knowing Misrepresentations Violated *Napue* and Its
Progeny.................................................................................................................................. 38

POINT III. The Trial Court Violated the Duty of Neutrality When It Threatened a
State Witness With a Perjury Indictment If He Did Not Change His Testimony and
Accuse Mr. Giles of Murder................................................................................................. 43

i

POINT IV. The Prosecutor's Misconduct During Summation Deprived Mr. Giles of a Fair Trial. ................................................................................................. 50

POINT V. The Prejudicial Effect of the Due-Process Violations Should Be Analyzed Collectively. ......................................................................................................... 57

POINT VI. At a Minimum, a Hearing Should Be Ordered. ...................................... 58

CONCLUSION ......................................................................................................... 58

**MEMORANDUM OF LAW IN SUPPORT OF**
**PETITION FOR A WRIT OF HABEAS CORPUS**

**PRELIMINARY STATEMENT**

Daikwan Giles petitions for a writ of habeas corpus under 28 U.S.C. § 2254, challenging a July 13, 2013 judgment of Bronx County Supreme Court, convicting him of 2d-degree murder and 2d-degree weapon possession and sentencing him to 25 years to life in prison, concurrent to a 10-year sentence for weapon possession. Petitioner is currently incarcerated at Great Meadow Correctional Facility under that judgment.

On January 11, 2019, Bronx County Supreme Court denied Mr. Giles' motion to vacate the conviction on federal due-process grounds. Exhibit A ("Ex. A").[1] A Justice of the Appellate Division later denied leave to appeal under C.P.L. § 460.15 (without opinion). *See* 2019 NY Slip Op 67469(U) (4/9/19). That Appellate Division order is not appealable to the Court of Appeals. *People v. Frazier*, 24 N.Y.3d 1200 (2015)

Later, on November 19, 2020, the Appellate Division affirmed the judgment of conviction on direct appeal. 188 A.D.3d 579 (annexed as Exhibit B ("Ex. B")). A Judge

---

[1] Petitioner has supplied four exhibits:

- Exhibit A-the Bronx County Supreme Court decision denying the motion to vacate the judgment under C.P.L. § 440.10;

- Exhibit B-the Appellate Division decision;

- Exhibit C-the paginated appendix filed in support of the motion to vacate (which includes trial transcripts); and

- Exhibit D-the papers filed in state court (at all stages of litigation).

of the New York Court of Appeals denied leave to appeal the Appellate Division's affirmance on February 11, 2021. *See* Exhibit D ("Ex. D") at 347.

This petition is timely as it was filed within one year of the "expiration of the time for seeking" a petition for a writ of certiorari—here, that deadline is July 11, 2022, one year and 150 days after a Judge of the New York Court of Appeals denied leave to appeal on February 11, 2021. 28 U.S.C. § 2244(d)(1)(A); *Shoy v. Annucci*, 2022 WL 1004615, *1 (S.D.N.Y. Apr. 4, 2022); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2000); United States Supreme Court Order, 589 U.S. ____ (issued Mar. 19, 2020 and effective through July 19, 2021), *available at* https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf (extending time to petition for a writ of certiorari from 90 to 150 days after the denial of discretionary state review); Ex. D at 347: Order Denying Lv. (Feb. 11, 2021).[2]

## INTRODUCTION

The prosecutor's egregious due-process violations in this homicide trial rendered the trial fundamentally unfair. The sheer volume of serious due-process violations here is rather unprecedented. The prosecutor: (1) doctored a critical police report to hide exculpatory information from the defense; (2) knowingly elicited false testimony from a police witness; (3) knowingly made false statements to the jury regarding hotly contested factual issues; and (4) engaged in rampant misconduct in summation.

---

[2] The federal claims raised here were exhausted in state court as they were raised at every level of the state court litigation (a motion to vacate the judgment before supreme court under C.P.L. § 440.10; an application for leave to appeal that C.P.L. § 440.10 order; a subsequent direct appeal to the Appellate Division; and a leave application to the New York Court of Appeals). 28 U.S.C. § 2254(b)(1)(A).

The trial judge also violated the due-process obligation to remain neutral. The trial judge confirmed his clear bias against the defense when it: (1) determined that a State witness' trial testimony that he could identify the suspect was false; and then (2) threatened that witness with a perjury indictment if he did not adopt his inculpatory grand jury testimony.

This Court should grant the writ to remedy these "extreme malfunctions in the state criminal justice system." *Harrington v Richter* 562 U.S. 86, 102 (2011).

## STATEMENT OF THE CASE

On the night of June 12, 2009, several teenagers were playing basketball on the street in the Bronx (Minerva Place and Creston Avenue). Juan Juarez was in that group. He was struck by four bullets and died that night.

Within a week, the State indicted Petitioner Daikwan Giles and co-defendant for murder, alleging that they acted in concert to cause Juarez' death. Both co-defendants proceeded to a joint trial.

### <u>The Doctored Police Report</u>

**A. The Defense's Specific Request for Evidence Before Trial**

Before trial, defense counsel expressly requested:

- the identity of "anyone interviewed in connection with this investigation [and] copies of all reports or notes written in connection with said interviews";
- exculpatory statements that conflicted with the testimony of a prosecution witness;
- "written or recorded statements of anyone"; and

- exculpatory "documents" and "books."[3]

### B. Mejia's Hidden Account

Hours after the shooting, numerous police officers canvassed the scene for witnesses. Police Report: A*i*; A444, A522. Officer Walton spoke to residents of 18 Minerva Place, which is several feet from the scene of the offense. One resident, Annabelle Mejia (18 at the time) told the police that she observed the shooting while she was outside her building. Police Report: A*i*; Transcript of Post-Trial Interview with Mejia: A50-72 (June 24, 2014) ("Mejia Transcript"). She stated that the shooter was a bearded, Hispanic male wearing a grey hoodie. Police Report: A*i*, Edelstein Aff: A10 ¶ 23; Mejia Transcript: A66-71. Mr. Giles and codefendant[4] are not Hispanic and did not have beards at the time of the shooting. *E.g.*, Bova Aff: Ex. D at 5 ¶ 7.

Mejia informed Officer Walton that she recognized the shooter from school and provided a yearbook containing the shooter's photograph. Neither codefendant nor Mr. Giles were depicted in the photograph. A*i*, A10 ¶ 23, A68-69.

The next day, Officer Walton prepared a police report ("DD5 16) summarizing Mejia's statement. A*i*. That report is reproduced below, with the relevant portion highlighted:

---

[3] A99, A101 ¶ (3)(j), A102 ¶ 4(j), A103 ¶ (5)(d), A106 ¶ 7(b)(iii), A106 ¶ 7(e), A108 ¶ 7(n), A111 ¶ 7(ff); DeMarco Affirmation: Ex. D at 350-51.

[4] As the codefendant's murder conviction was ultimately vacated and dismissed, his name is omitted here.

Topic/Subject:
(CANVASS) CANVASS FOR WITNESSES / VIDEO- 18 MINERVA PLACE

Summary of Investigation:
1. On June 12, 2009, AT APPROX, 2315HRS THE UNDERSIGNED ALONG WITH DET. ALBERT OF THE 48PCT PDU DID CONDUCT A CANVASS FOR WITNESSES AND VIDEO AT 18 MINERVA PLACE AS REGARDS THE ABOVE LISTED CASE. THE RESULTS ARE AS FOLLOWS:
=18 MINERVA PLACE:
VIDEO:
- AS PER SUPER-LUIGJ PRELA; NO VIDEO
-WITNESSES CANVASS;
APT:
-6A; CARLOS PENA- HEARD SEVERAL SHOTS / SAW NOTHING
-6D; MARITZA SILVA- HEARD " FIRECRACKERS" / SAW NOTHING
-6B; JAVIER ACOSTA- STATES THAT HE WAS NOT AT HOME AT THE TIME
-5H; DALE MARI NO- SAW / HEARD NOTHING
-5E; THOMAS RATCLIFF- HEARD 5 OR 6 SHOTS / SAW NOTHING
-5G; ANABELLE MEJIA- HEARD SHOTS / STATES THAT SHE SAW SHOOTER, STATES THAT HE WAS A TALL DARK SKINNED MALE WITH A GRAY SWEATER AND GRAY HOODY WITH BLUE JEANS. STATED THAT HE HAD A HEAVY BEARD. DET. MERCADO-GOMEZ ADVISED.
-4D; CLAUDIA BATISTA-HEARD MULTIPLE SHOTS / SAW NOTHING.
-4A; LENNY PELO HEARD ABOUT 6 SHOTS / SAW NOTHING.
-4E; BOLIVAR MIRAVA-HEARD 4 OR 5 SHOTS / SAW NOTHING
-4G; ALTA TAVALES- GUSILLA GUILLON- HEA RD ABOUT 4 SHOTS / SAW NOTHING
-3E; SANDRA PINSKY-SAW / HEARD NOTHING
-2C; TERESA KUBIA- JUST GOT HOME FROM WORK- SAW / HEARD NOTHING
-2E;LOU ALFALLA- HEARD MULTIPLE SHOTS / SAW PEOPLE RUNNING, DID NOT SEE PERP, SAW C / V ON GROUND.
1D; SUPER- LUIGJ PRELA- SAW / HEARD NOTHING
1F; EVETTE MARTINEZ-HEARD SHOTS / SAW NOTHING
2. FOR YOUR INFORMATION.

The prosecutor did not disclose DD5 16 to the defense. DeMarco Aff. ¶ 11: Ex. D at 350-51. Instead, without securing a protective order or notifying the defense, the prosecutor (A.D.A. Adam Oustatcher), doctored the report by whiting out the Mejia reference:

Topic/Subject:
(CANVASS) CANVASS FOR WITNESSES / VIDEO- 18 MINERVA PLACE

Summary of Investigation:
1. On June 12, 2009, AT APPROX, 2315HRS THE UNDERSIGNED ALONG WITH DET. ALBERT OF THE 48PCT PDU DID CONDUCT A CANVASS FOR WITNESSES AND VIDEO AT 18 MINERVA PLACE AS REGARDS THE ABOVE LISTED CASE. THE RESULTS ARE AS FOLLOWS:
=18 MINERVA PLACE:
VIDEO:
- AS PER SUPER-LUIGJ PRELA; NO VIDEO
-WITNESSES CANVASS;
APT:
-6A; CARLOS PENA- HEARD SEVERAL SHOTS / SAW NOTHING
-6D; MARITZA SILVA- HEARD " FIRECRACKERS" / SAW NOTHING
-6B; JAVIER ACOSTA- STATES THAT HE WAS NOT AT HOME AT THE TIME
-5H; DALE MARI NO- SAW / HEARD NOTHING
-5E; THOMAS RATCLIFF- HEARD 5 OR 6 SHOTS / SAW NOTHING



-4D; CLAUDIA BATISTA-HEARD MULTIPLE SHOTS / SAW NOTHING.
-4A; LENNY PELO HEARD ABOUT 6 SHOTS / SAW NOTHING.
-4E; BOLIVAR MIRAVA-HEARD 4 OR 5 SHOTS / SAW NOTHING
-4G; ALTA TAVALES- GUSILLA GUILLON- HEA RD ABOUT 4 SHOTS / SAW NOTHING
-3E; SANDRA PINSKY-SAW / HEARD NOTHING
-2C; TERESA KUBIA- JUST GOT HOME FROM WORK- SAW / HEARD NOTHING
-2E;LOU ALFALLA- HEARD MULTIPLE SHOTS / SAW PEOPLE RUNNING, DID NOT SEE PERP, SAW C / V ON GROUND.
1D; SUPER- LUIGJ PRELA- SAW / HEARD NOTHING
1F; EVETTE MARTINEZ-HEARD SHOTS / SAW NOTHING
2. FOR YOUR INFORMATION.

A*ii*; DeMarco Aff. Ex. D at 351 ¶ 15-17.

The case proceeded to trial in 2013. The State never disclosed a complete version of DD5 16 or any information about Mejia. *E.g.*, Demarco Aff: Ex. D at 351.

## Trial Evidence

### A. The Police Remove a Teenager from His Bed at 3 a.m.

At 3 a.m. on the morning after the shooting, numerous police officers entered the Giles family apartment, looking for 17-year-old Daikwan Giles. A448-52, A514, A523. The officers pulled Daikwan out of his bed, handcuffed him, and brought him to the precinct without telling him why he was being arrested. A457-58. Inside the apartment, the police found no evidence linking Daikwan to the homicide. A518-20.

### B. The Un-Recorded Interrogation

After taking Daikwan to the 52nd precinct, the police locked him in an 8 x 5 room. A459-60, A525. The police did not allow any phone calls until 16 hours later. A523-26. There is no evidence that Daikwan slept, ate, drank, or used the bathroom during this entire ordeal.

Detective Mercado-Gomez and Detective Garcia[5] interrogated Daikwan at 5:15 a.m. A462. They did not record the interrogation. A449. Instead, Detective Mercado-Gomez offered a general account of the interrogation: "we basically [told] him why he's there" and that "we would like to find out, you know, what happened. Why did it take place. What did he do. Things like that." A463, A470.

Daikwan spoke to the police for about 20 minutes. A471. The detective then wrote out a statement, which Daikwan signed:

---

[5] Detective Garcia did not testify at trial.

I was approached by about 6 or 7 male Hispanics from 198th Street about a problem we had three years ago. "Elias" walked up to me and asked, "What's good now? What's good now?" Elias reached into his front pants pocket and pulled out a silver gun. I told Elias to shoot it. "No," he stated. "The only I [sic] won't shoot you right now is because you're a snitch." All the males walked away. This happened at 2:30 in the afternoon.

About eight o'clock at night, I went and got the gun and went to 198th Street. I approached the same group of males and asked about Elias. They all started speaking Spanish and started walking towards [sic]. I began to get nervous and pulled out the gun from my back pocket. I just started shooting at the group. I was not shooting at any one person. I just started shooting. I didn't see anyone get hit. I ran away afterwards. I got into a cab to get away.

At about ten o'clock I went to the movies with my girl. We saw Pelham 123. I did not have the gun at that time. I threw the gun down a sewer at Creston Avenue and 196 St. (Pros. Ex. 70; In Evidence: A465).

During his direct, Detective Mercado-Gomez (a 20-year veteran of the NYPD) repeatedly testified that he did not record the interrogation because it was not NYPD policy to do so. A449, A473. On cross, defense counsel elicited justifications for numerous NYPD protocols. A501-02, A506-07, A513, A518, A524-25, A529-30, A543-44. For instance, the detective confirmed that the NYPD photographs lineups to subsequently prove their fairness to a jury. A543-44. Still, the detective had "no idea" why the NYPD does not record interrogations. He had "reasons for every other protocol" he followed except that one. A541-42.

### C. Post-Interrogation Investigation

After the interrogation ended at 5:40 a.m., the police locked Daikwan inside the small interrogation room for seven additional hours. A531, A535. Meanwhile, that morning's investigation yielded additional information:

- six .380 caliber bullets were found at the scene (A166);

- one bullet was from either a .38 or .357 caliber firearm (A526-27);

- two shooters were involved (A285); and

- Juan Juarez was shot four times (A316-18, A526-22, A561).

The police uncovered no evidence corroborating Mr. Giles' statement. The police neither located "Elias" nor the taxi driver referenced in the written statement. A532-33. The police searched the sewers near the Minerva/Creston intersection, finding nothing. A474-75.

### D. The Second Interrogation

At 12:26 p.m. the next day, Bronx A.D.A. Gensler (who also did not testify) interrogated Mr. Giles at the Bronx Homicide Task Force. *See* Video: Ex. 71;[6] A528. Detective Mercado-Gomez was present during the videotaped interrogation. Ex. 71.

On the video, Daikwan looks exhausted and appears to be having difficulty keeping his eyes open. A.D.A. Gensler never asked him whether he had slept. *Id.*

Daikwan added details consistent with the new information the police had acquired after the earlier interrogation. For instance, Daikwan's prior statement did not mention the number of shots or the weapon's nature. But after the police had learned (from ballistics and autopsy evidence acquired that morning) that four shots were fired with a .380 caliber firearm, Daikwan now stated he fired four shots with a ".380." Video 12:29-12:30; Dr. Kappen: A304 (testifying that during the autopsy conducted that morning, she located four gunshot wounds); Mercado-Gomez: A527

---

[6] Hereinafter referenced with timestamps.

(that morning, he received a report that the police located six .380 caliber bullets).

Additionally, Daikwan now stated, consistent with the freshly acquired ballistics evidence, that there was another shooter who fired a .357 revolver. Video 12:38-12:39; *see* Detective Fox: A278 (testifying that on the morning of the shooting, he located a bullet that could have been from a .357); A285 (ballistics confirmed that there were two shooters). A.D.A. Gensler asked him, "You don't want to say who your friend was?" Video 12:39. Daikwan answered, "I told the other officer," pointing at Detective Mercado-Gomez. *Id.* at 12:39. The prior written statement, however, did not mention another individual. When pressed, Daikwan stated that the man's name was "Boogz." *Id.* at 12:39. Daikwan did not know at whom Boogz fired and he never mentioned Juan Juarez. *Id.* at 12:34. The police never located a Boogz and the jury never learned a single thing about Boogz.

### E.  Jeremy Lantigua Cannot Identify Mr. Giles at Trial

Jeremy Lantigua, a ninth-grader at the time of the shooting, claimed that for five seconds that night, he observed a stranger fire a weapon. A228, A230. Lantigua could not identify anyone in court. A229. But four years earlier, he picked Mr. Giles out of the lineup. A226. Before that lineup, a police officer told Lantigua "the shooter would be in that line-up," so Lantigua believed he was going to see the shooter. A233-34, A245-46. Lantigua then identified Mr. Giles through a process of elimination: "I see six men, six males, but none of them looked familiar as what I seen from the day before. Only one of them." A226.

### F.  Marcos Nolasco's Testimony

By 2009, Marcos Nolasco, a 17-year-old drug dealer, had numerous misdemeanor convictions. He had been sentenced to 18-months' incarceration for slashing someone's face with a box cutter when he was 14. A630-33. During prior arrests, Nolasco provided the police a fake name to evade prosecution. A543-44, A625-26.

Five days after the 2009 shooting, Nolasco was arrested on a Bronx rooftop after throwing marijuana off a roof and wrestling an officer. The police charged him with resisting arrest, trespassing, and marijuana possession. A591-92.

Up to that point, Nolasco had never said anything about the shooting. But now, after his arrest, Nolasco "wanted a deal." A592, A638-39. So, "all of the sudden," he remembered that Mr. Giles and codefendant (both of whom he knew from the neighborhood) were the shooters. A568, A592, A611. Nolasco knew Mr. Giles was involved "from the get-go" and realized codefendant was involved after Nolasco's arrest. A592.

In pursuit of his deal, Nolasco met the prosecutor and testified before the grand jury, identifying both Mr. Giles and codefendant as the shooters. A592, A613, A644.

For his rooftop arrest, Nolasco pled guilty and received five days' community service. A593. He never completed that service; a warrant issued; he disappeared for two years; and he was rearrested in 2011. A551-52, A594-95, A616-19. Upon his arrest, the trial prosecutor (whom Nolasco referred to as "Adam") immediately met with Nolasco and discussed the Juarez shooting with him. A594, A620-21. Nolasco only spent a few hours in jail and received no sanction for his failure to do community service. A594, A616-21.

10

By the time of Mr. Giles' 2013 trial, Nolasco had open menacing and harassment charges (in Suffolk County), which involved a gun. A565-66, A599-601. Essentially testifying, the prosecutor led Nolasco into minimizing the benefits he had obtained: "Beyond buying you an egg and cheese and a coke, have I ever given you any benefit for coming forward." Nolasco answered, "No." A595. When defense counsel asked Nolasco about his open menacing and harassment charges, he invoked the Fifth Amendment. A600-01.

Nolasco testified that on June 12, 2009, at about 4 p.m., two people approached him on the street. A563, A570-75. They said they were looking for "Alita." A570. Nolasco claimed these two men were Daikwan Giles and "Havoc." A570-71. The prosecution introduced no evidence regarding an Alita or Havoc.

Later that night, Nolasco was high on marijuana and hanging out with Juarez near Minerva and Creston. A570, A596-97. Juarez stayed behind at the intersection to play basketball; Nolasco left the intersection and walked down Creston. A570, A576. Nolasco claimed that Mr. Giles, "Havoc," and two others on bikes approached Nolasco. *Id*. Mr. Giles, he alleged, asked about Juan's whereabouts so he could fight him. A577.

Nolasco then claimed he saw Mr. Giles fire a white, .38 caliber revolver multiple times while Mr. Giles was standing at the street corner. A571, A577-79, A583, A591; Diagram: Ex. 72. He knew the firearm's precise nature because he had watched movies, read magazines, and played videogames. A598.

Nolasco testified he was three feet from the shooter when the shots were fired. A577-78. Before the grand jury though, he testified that he observed the shooting "from a distance" after walking away from the street corner. A642. He saw no conflict

in these accounts. A644.

Instead of running after hearing gunshots, Nolasco stood put and looked to his right. There, he saw another individual, who was wearing a gray hoodie over his head, running northwest towards Creston and Minerva. A579-80. Nolasco saw the right side of this hooded man's face for a few seconds. A592, A646. This second individual, whom he identified as the co-defendant, fired in Juan's direction. A582. The two shooters ran down Creston towards Nolasco. There, Nolasco claimed, they passed a gun to two other men on bikes. The four men ran off. A585-87.

Nolasco identified Mr. Giles as the shooter in court. A566-57. He was the only witness to do so.

While Nolasco claimed at trial that he was not "seeking" a benefit in exchange for his cooperation, he testified before the grand jury that he "expected" one. A636-38. When pressed on the contradiction, Nolasco distinguished between "seeking" and "expecting": "I don't feel like expecting is the same thing as seeking. Obviously, if you give a helping hand, you expect that one hand washes the other, [but] seeking is different . . . it's a thin line." A639.

### G. The Court Threatens Rodriguez With a Perjury Indictment

Before Carlos Rodriguez (19 at the time of trial) testified, the prosecutor stated, in Rodriguez' presence (and outside the jury's presence), that he had recently provided Rodriguez with his grand jury minutes and told him he was calling him to testify about the homicide. Rodriguez had told the prosecutor that he did not remember anything and didn't want to testify. A327-28.

The prosecutor accused Rodriguez of feigning a "lack of memory." A328. The

prosecutor explained that if he determined that Rodriguez' testimony was false, he would "ask for a material witness hearing, he should be assigned counsel, and we could go from there." A328-29. Before hearing any testimony from Rodriguez, the trial court reinforced the prosecutor's warnings, telling Rodriguez that if the court determined Rodriguez was lying or being evasive, there would be "consequences," including incarceration for contempt. A328-29.

Outside the jury's presence, Rodriguez testified that he did not remember the shooting and did not know the shooter's identity. A330-31. The prosecutor reminded Rodriguez that he had testified differently before the grand jury. A331.

Still outside the jury's presence, the court told Rodriguez that if he did not testify truthfully, "that constitutes the crime of perjury, and you can be arrested and charged with the crime of perjury as a felony and be prosecuted for that crime should you not answer questions truthfully." A331. Rodriguez said he did not want to testify; the judge answered, "I don't care if you want to or not. You're going to testify or you're going to jail. . . . [A]nd if you really screw up, you're going to jail with a criminal charge, a felony." A331-32. The court warned Rodriguez that if his testimony "warrants further action, I will assign counsel to you, and then we'll take it from there." A332.

Now before the jury, Rodriguez acknowledged that, in ninth grade, he tried to kill a stranger by shooting him in the leg. A335-36, A422, A435. He cited "self-defense" and "street problems." A424. Rodriguez was convicted of attempted murder and incarcerated. A335-36.

As for the 2009 shooting, Rodriguez testified that a single individual fired several

shots while standing four-car-lengths away from the corner of Minerva and Creston. Pros. Ex. 68: Diagram; A342-43. Rodriguez was shot in the right foot during the incident. A345.

Beyond skin color, Rodriguez knew nothing about the shooter because he observed the shooting from far away. A340-43. When asked about the shooter's age, Rodriguez testified, "I ain't got to see him like that." A339. He did not even see the individual holding a gun; he had just heard a gun fire. A343.

Rodriguez did not recall whom he selected from a lineup. A344-47. He "just picked somebody" because he was young and frazzled. A343.

The prosecutor then attempted to ask Rodriguez about his grand jury testimony. A347. Defense counsel objected and the jury was excused. A347.

The court declared that it believed Rodriguez was committing perjury and threatened Rodriguez with a perjury indictment if he did not change his testimony:

> I am satisfied that you are not testifying truthfully and . . . intentionally feigning the fact that you don't remember certain events. Therefore, I'm going to assign you an attorney so that that attorney could discuss with you the consequences of lying under oath, that being a perjury indictment, as well as the possibility of civil contempt.
>
> That attorney will speak to you before you are asked to continue, *and in the event that you maintain the position that you've maintained, you will face the consequences that I've just suggested*. A348.

Still outside the jury's presence, the prosecutor read Rodriguez' grand jury testimony in his presence. A349-56. In doing so, the prosecutor reminded him that: (1) he had testified that he saw Mr. Giles fire six or seven shots; and (2) he had identified Mr. Giles in a lineup. A349-56.

The court again threatened Rodriguez with a perjury indictment if he did not "change" his testimony:

> [I]f your testimony *does not change* with respect to the material issues that you've testified to that are so completely contradicted by your prior statements, *you will be subject to a perjury indictment and an arrest and prosecution for the crime of perjury*. Additionally, I will take under advisement any other action that might be taken regarding contempt.
>
> At this point before I allow that to occur, before I allow the district attorney to consider having you arrested and charged with perjury, I'm going to give you a moment to speak to an attorney, Mr. Horn, and make a determination of how you wish to proceed, but I am cautioning you now that although I'm not a prosecutor and I'm not acting as one, in my judgment, what you have done thus far satisfies the elements of the crime of perjury, and therefore, *it is a real possibility* that you will be arrested and charged on that crime if *this persists*. A360.

The court then suggested, sua sponte, that the prosecution could introduce Rodriguez' grand jury testimony under the "past recollection recorded" exception. A362-64, A402. Defense counsel responded that under this exception, the prior testimony must be accurate. A365. The court agreed, noting that the prosecution might not be able to satisfy that standard. A365-66.

The prosecutor asked if Rodriguez previously testified truthfully before the grand jury, which Rodriguez confirmed. A375. The prosecutor then impeached Rodriguez with his grand jury testimony, reading his inculpatory grand jury testimony to him and confirming that Rodriguez recalled providing it. A376-90. Through leading questions, the prosecutor led Rodriguez to confirm: (1) his grand jury testimony reflected "what [he] observed with [his] own two eyes" while the incident was fresh in

his mind; (2) he now lacked a recollection; and (3) he could not remember exactly what happened. A387-88. The court then admitted the grand jury testimony into evidence. State's Trial Ex. 69; A398, A402. The prosecutor read the entire testimony to the jury, consuming 15-transcript pages. A405-19; State's Trial Ex. 69.

During cross, Rodriguez repeated that he did not know the shooter's identity, adding that he picked someone from the lineup because the detective told him to select someone. A431, A433. He identified Mr. Giles during the grand jury because he was nervous and many "things [were] going on." A431-42. When asked if he lied to the grand jury, Rodriguez responded: "I don't lie. . . . I was nervous. [Many] things [were] going on that day . . . I don't know." A433.

## Summation

The prosecutor delivered a 55-page summation, which represented 10% of the trial testimony. That summation triggered 20 objections and a joint mistrial motion.[7]

### A. The Prosecutor Testifies to Facts Not in Evidence

#### 1. The Non-Recording of the Interrogation

In his summation, Mr. Giles' counsel—building on his cross-examination of the lead detective—vigorously contended that the detective's failure to record the interrogation indicated he was hiding coercive or unreliable interrogation tactics. A667. Counsel assured the jury that the prosecutor's summation would not offer any

---

[7] During Mr. Giles' counsel's summation, the prosecutor objected twice. Both objections apparently challenged defense counsel's reference to the prosecutor's opening statement, which the court held was not "evidence." A654, A671-72. During codefendant's counsel's summation, the prosecution never objected.

reason why the NYPD does not record interrogations. A674.

In his summation, the prosecutor addressed the defense's non-recording argument by testifying to purported facts that were not in evidence. A715. "Here's, the truth," the prosecutor stated: "The police didn't have a working video camera." A715. Counsel objected that there was "no evidence of that" and the prosecutor stated, "withdraw[n]." A715.

The prosecutor then attacked defense counsel for relying on "false information" because there was no "evidence" that, in 2009, the police had a functioning camera. A715-16. "Now I know you want to walk your client out of this courthouse, but at least be truthful." A715-16.

### 2. Deals on Misdemeanors

The prosecutor told the jury (without any record support) that he does not offer deals to witnesses accused of misdemeanors. A752. He only gives deals to those accused of a non-violent felony that is not a "sex crime." A752.

### 3. Threats

The prosecutor referenced threats even though there was no evidence of any threats: "The reality you saw [is] life on the street. What happens to snitches, to witnesses getting caught up in their own shootings, to witnesses feigning to forget being shot . . . When you bring the street into a court of law, often [ ] the street wins. . . . Rodriguez's reality does not end with your verdict . . . That's the basic undeniable truth underlying his testimony . . . and why he said what he said." A741, A746.

The prosecutor again referenced threats when he stated that the jury's response to Nolasco's desire for a benefit "should be, of course he expected a benefit from giving

that information, for giving truthful testimony. It will be crazy to expect anyone to step up to that chair at a murder trial under any other circumstances." A751. Counsel objected and the court held, "This is argument, I'll allow it." A751.

### B. The Prosecutor Attacks Defense Counsel

The prosecutor delivered a parable about dishonesty, discussing his childhood past of "stealing packs of Tops baseball cards." A716-17. When his grandfather (who stormed the "beach at Normandy") caught him stealing, his grandfather told him, "You are the master of your words, after you speak your words have mastered you." A717. The prosecutor then used this story to attack defense counsel and his client: "And the irony of this situation where these false statements of fact that are relied upon in arguments is that Mr. Demarco finds himself in the same situation as his client." A717. Counsel said "objection[;] [f]alse statements of fact - -," but the court cut him off and said, "I'll hear the argument." A717.

### C. "Hell" and "Devils"

The prosecutor pressed that "if an act is committed in hell, the witnesses would be devils . . . Now, I'm not calling Marcos an angel [or] a devil. What I'm saying to you is [he] has the same record you would expect of someone who saw what he saw. He has the same exact record with respect to someone who [the defendants] would feel comfortable enough in front of." A754-59. The court sustained counsel's objection and told the jury to "disregard." A755.

### D. The Streets and Sympathy

The prosecutor stressed that this case was about "the street" and "real crime." A701. The jury had "received . . . an education in real crime. This is how it goes down

18

in the streets in real life." A701. The "basic truth of this case" was that the "street killed Juan Jerez," who was "just one more body on one more corner in the Bronx. Nothing that happens in this courtroom can undo what's been done. Nothing is going to bring him back." A740-41.

The prosecutor also discussed "the pack": "We may never know who fired the fatal shot . . . and the judge will talk about that in his charge. The way I say it is, in human terms, when you run with the pack, you get credit for the kill. And now it comes to you, the jury, to hold the defendants responsible, to give them the credit they deserve, to hold them responsible for their choices and their conduct." A759-60.

The prosecutor invoked sympathy and attacked Mr. Giles' family:

> [Defense counsel stated that] Defendant Giles has been in jail for almost four years [and that his family was in attendance]. Juan Jerez has been in a box in the ground for four years and will never see his mother again. I'm glad there is family in court to support the defendants at this trial. I wish there was family involved back on June 12, 2009. We spoke in jury selection about not playing the sympathy [card], but if you want to do it, it goes both ways. A708.[8]

Continuing his emotional theme, the prosecutor told the jury, "I've been carrying this case, the death of a 15 year-old boy for four years, and when I sit down, I'm giving Juan Jerez to you, the People of the Bronx." A760.

The prosecutor added that while Detective Mercado-Gomez had "nerves," had a "bad memory," hesitated, and feared "making a mistake" on the stand, "You don't get a free pass on a murder just because the detective who was assigned to catch the case

---

[8] In his summation, Mr. Giles' counsel stated, without objection, that this case was "especially important to [the codefendants], who are seated at that table . . . It's also important to their families, who've been here throughout this trial." A651-52.

couldn't answer every question put to him at trial." A704.

### E. "Judge Me"

The prosecutor stressed his commitment to this case, telling the jury that "[t]his morning I saw the sun rise from my office. I've been waiting years to give this summation . . ." A701.

Expanding on this theme, the prosecutor turned this case into a referendum on his integrity, imploring the jury, over defense counsel's repeated objection, to "judge [him]." A707-08. The prosecutor expressly recognized that in doing so, he was "step[ping] back from the evidence." A707-08. He added: "If you think I've been rude, disrespectful, improper to anyone who has set foot in this courtroom over the course of this trial, anyone in the audience, any witness, any court officer, any reporter, defense attorneys, anyone, I want you to hold it against me. I want you to hold it against my case. I ask you to do that. . . . Accusations against a lawyer might fly in some courtrooms, against some lawyers, but not here." A709.

### F. Mistrial Motion

Defense counsel moved for a mistrial because of "several comments that . . . were improper and several comments that the Court sustained objections to on the prosecution's summation in furtherance of an application for a mistrial." A761. Counsel cited the prosecution's argument that Mr. Giles' association with Nolasco makes him "like Marcos Nolasco is improper comment. Your Honor sustained that objection. It's nothing more than an appeal to the jurors' fear and community safety. If they are to conclude that [the codefendants] are like Marcos Nolasco, that's reason enough to convict . . . It's an improper comment. Your Honor sustained my objections."

A762-63.

Co-defendant joined Mr. Giles' objections and argued that the prosecutor's summation deprived the codefendant of a fair trial. A763-64. Co-defendant pressed that the prosecutor launched personal attacks on both counsel, testified to facts not in evidence, and vouched for Nolasco's credibility. A763-64.

The trial court denied the mistrial motion, finding that the prosecutor did not "cross the line" and deprive Mr. Giles of a fair trial. A768-73. "Ultimately," the court held, "they're words . . . it takes a lot . . . to ruin a trial . . . to take the case out of the realm of rational thought and into the realm of reaction." A771-73.

### Verdict and Sentence

Throughout four days of deliberations, the jury sent out six notes, requesting (among other things) Nolasco's testimony. The jury convicted both defendants of intentional murder and second-degree criminal possession of a weapon.

The court sentenced Mr. Giles to 25-years-to-life in prison, concurrent to a 10-year-determinate sentence for the second-degree weapon count.

### Codefendant's Motion to Vacate the Conviction

On July 16, 2013, codefendant moved to set aside the verdict on newly discovered evidence grounds, submitting a statement from his sister, Ms. Truesdale. A895-905. Truesdale explained that a Ms. Annabelle Mejia had informed her that codefendant was not the shooter. A903.

In response, A.D.A. Oustatcher argued that the codefendant could have produced this evidence at trial with due diligence by canvassing the scene and speaking to

witnesses while "wearing a recording device." A908-09. He never stated that he had actually disclosed the un-doctored police report mentioning Mejia's statement.

The trial court denied the motion, A895-96, and sentenced both defendants to 25-years-to-life in prison.

### Mejia's Account Surfaces

Almost a year after sentencing, a private investigator met with Mejia and recorded her statement. A8-12, A46-72. Mejia stated that she observed the shooting while with her friends outside her residence, which is a few feet from the shooting's location. A50-57, A894. Mejia told the private investigator that, before the trial, a police officer interviewed her. A63-71. She told the detective that the shooter was wearing a hoodie and was Hispanic; neither of the codefendants are Hispanic. A62-71. She also provided him a yearbook depicting the suspect, with whom she went to school. A66, A68. After her conversation with the detective, Mejia never heard from the police again. A68.

During her conversation with the private investigator, Mejia examined a photograph of the codefendant. She stated that he was not the shooter. A10 ¶ 23, A68-69.

### The State Discloses That the Mejia DD5 Was Doctored

On March 17, 2017, almost four years after the trial, the Bronx District Attorney's Office disclosed an undoctored version of the Mejia police report to Petitioner's post-conviction counsel. Bova Affirmation: Ex. D at 13 ¶ 42 (Feb. 7, 2018); Zapata Affirmation ¶ 23 (July 12, 2018): Ex. D at 78-79 (recognizing that this police report had never been disclosed to the defense before or during trial).

On April 17, 2017, Bronx County Supreme Court vacated codefendant's conviction with the prosecution's consent. A913a-g. The court explained that the prosecution had discovered a "*Brady* violation"—that is, the trial prosecutor (no longer with the Bronx District Attorney at the time) had concededly failed to disclose an exculpatory police report. A913e. On October 25, 2017, the court dismissed the indictment against the codefendant with the prosecution's consent. A913h-j.

On October 25, 2017, the prosecution moved to dismiss the charges against codefendant, thus implicitly recognizing that Marcos Nolasco's testimony—the only evidence against him—was unreliable. The court dismissed the charges. A913h-j.

### The C.P.L. § 440.10 Litigation

Mr. Giles then moved, under C.P.L. § 440.10(1)(h), to vacate his conviction on federal due-process grounds. Specifically, he argued that the State:

- violated *Brady* in doctoring and then failing to disclose the Mejia police report;

- elicited false testimony from Detective Mercado-Gomez about the subject of that suppressed report, that is, during his "interviews with . . . witnesses" who lived in the shooting's vicinity, neither he nor "any member of [his] team" learned about "the second shooter" (Mercado-Gomez Direct: A461-62);

- failed to disclose, and then elicited false testimony about, the prosecutor's coaching of Nolasco; and

- continued to misrepresent the truth about the suppressed Mejia DD5 in summation and committed an additional slew of misconduct in summation outlined above.

Viewed individually or collectively, these persistent due-process violations prejudiced the defense. Bova Aff: Ex. D at 1-18; Def. Mem. Law: Ex. D at 37-50.

In response, the State conceded that the prosecutor had suppressed the police

23

report's contents and Mejia's existence. Zapata Affirmation ¶ 23 (July 12, 2018) (Ex. D at 78-79).

### The 440 Decision

The post-conviction court ("440 court") found no *Brady* violation. Ex. B: Decision 1-9. The court first held that "DD5 16, while exculpatory with respect to co-defendant . . . is not exculpatory with respect to [Petitioner.]" *Id.* at 5. "The fact that Mejia's description also appears to exclude defendant is inconsequential, as he was by his own admission, the other shooter. Thus, DD5 16 does not pertain directly to defendant and does not serve to exculpate him and fall within the [State's] duty to disclose material exculpatory evidence [under] *Brady*." *Id.* at 6.

Next, the court held that the police report was inadmissible hearsay and suggested that Petitioner could not necessarily prove that Mejia would have volunteered to testify at trial. *Id.* at 6-7. The court never explained why the report's admissibility mattered, as the defense's position was that Mejia would have *testified* at trial had the State disclosed Mejia's account. Pet. Reply Brief: Ex. D at 142. Nor did the court explain why Mr. Giles could not have simply subpoenaed Mejia had she refused to make herself "availabl[e]" to testify. *Id.* at 6 n.10.

Further, the court suggested that Mejia may not have "see[n] the shooting" but only a hoodie-wearing "Hispanic male holding a gun . . . after the shooting had transpired." *Id.* at 7.

Alternatively, the court held that eyewitnesses (only one who actually identified Mr. Giles in court), the "two voluntary recorded confessions," and "corroborating forensic evidence" established "no reasonable possibility that [Mejia's account] would

have changed the result . . . had it been disclosed." *Id.* at 8. Although Mr. Giles had argued that the confession was unreliable, the court found this claim "contradicted by the Court's own finding after the *Huntley* hearing that his statements were voluntarily made and also by his own most recent admissions in his affidavit in support of codefendant's 440 motion." *Id.* at 8 n.12.[9]

The court then found "nothing improper regarding the trial prosecutor's questioning of" Detective Mercado-Gomez. *Id.* at 8-9.

Mr. Giles sought a certificate granting leave to appeal to the Appellate Division under C.P.L. § 460.15. He sought review of "all of the state constitutional, federal constitutional and statutory claims raised below, including [his] important state and federal due process claims." Ex. D at 164-79. A Justice of the Appellate Division denied leave to appeal without issuing any decision.

### Direct Appeal

On direct appeal to the Appellate Division, Mr. Giles argued that: (1) the State's misconduct in summation violated due process; (2) the trial judge's bias against the defense—demonstrated by his aggressive effort to create evidence against Mr. Giles

---

[9] Co-defendant's counsel, without notifying Petitioner's post-conviction counsel, secured a statement from Mr. Giles from prison in 2016. State's Supp. Appdx. in Opp. to 440 Motion at SA1-2. That statement does not admit involvement but merely states that "[codefendant] was not involved in this crime"; codefendant was "not with me before, during or after the shooting"; codefendant was not at the scene of the shooting and did not participate in it"; and "I was not a friend or acquaintance or [codefendant]." *Id.* Before the 440 court, Mr. Giles sought to strike this statement on the grounds that it was obtained in violation of the ethical prohibition on obtaining a statement from a represented party. *See* Petitioner's 440 Motion Reply: Ex. D at 143 n.4 (citing New York Rules of Professional Conduct Rule 4.2(a)-(b)).

by threatening Rodriguez with a perjury indictment if he did not accuse Mr. Giles of murder—violated due process; and (3) the prosecutor violated due process by falsely telling the jury that the police lacked a working camera during the interrogation. Ex. D at 216-43.

The Appellate Division affirmed. The court held that the "challenged portions of the People's summation generally constituted fair comment on the evidence, reasonable inferences to be drawn therefrom, and permissible responses to defense arguments. To the extent there were improprieties, there was nothing so egregious as to require reversal." Ex. A at 1.

In rejecting the judicial-bias claim, the Appellate Division adopted the State's factual claim that the court did not threaten a perjury indictment if Rodriguez refused to adopt his grand jury testimony but "only told Rodriguez to tell the truth." State's Brief: Ex. D at 279. As the Appellate Division held: "we find no error warranting reversal when, without objection and outside the jury's presence, the court warned an uncooperative witness, whose trial testimony contradicted his grand jury testimony, that he could be prosecuted for perjury. The court identified the conflict in the witness's sworn statements, directed him to tell the truth, and correctly stated the possible legal consequences involved." Ex. A at 2.

The court did not address Petitioner's argument that the prosecutor lied to the jury when he stated that the police did not record the interrogation because they lacked a "working camera." Ex. D at 241-42.

On his application for leave to appeal to the New York Court of Appeals, Mr. Giles renewed the due-process claims he raised before the Appellate Division. Ex. D at 329-48. A Judge of that Court denied leave to appeal on February 11, 2021. Ex. D at 347.

### ARGUMENT

### POINT I

**The post-conviction court's decision rejecting Mr. Giles' *Brady* claim involved an unreasonable application of, and was contrary to, clearly established law.**

## A. Governing Standards and Overview

Under *Brady v. Maryland,* 373 U.S. 83 (1963), the prosecution must disclose evidence that is: (1) favorable to the defense and (2) within the prosecution or police's control. *Kyles v. Whitley,* 514 U.S. 419 (1995). The State's suppression of such favorable evidence violates due process if the evidence is "material"—that is, there is "'any reasonable likelihood' the suppressed evidence could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Fuentes v. Griffin*, 829 F.3d 233, 246 (2d Cir. 2016). A defendant need not show that the nondisclosure was the verdict's "but for" cause. *Kyles*, 514 U.S. at 434. Instead, he need only show the nondisclosure was sufficient to "undermine confidence in the outcome." *Id.* As a verdict must be unanimous, defendant need only show "a reasonable probability that at least one juror would have" voted to acquit. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

A federal court must issue a writ of habeas corpus if two conditions are satisfied:

(1) a conviction violates the federal constitution; and (2) AEDPA[10] does not bar relief. 28 U.S.C. § 2254(a),(d)(1)-(2). AEDPA does not bar relief if: (1) the state court's last merits decision did not reach the merits of the federal claim; or (2) the last merits decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018); *Greene v. Fisher*, 565 U.S. 34, 40 (2011); *Drake v. Portuondo*, 321 F.3d 338, 347 (2d Cir. 2003).

A state-court decision "unreasonabl[y]" applies clearly established law in two ways. First, if no fair-minded jurist could adopt the state court's ultimate resolution of a legal question, the decision is unreasonable. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The analysis requires deference, not "abdicat[ion]," of judicial review. *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 256 n.83 (3d Cir. 2020).

Second, if a state court decision's "specific reasons" for rejecting a federal claim are unreasonable, AEDPA is also overcome. *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (internal quotation marks omitted); *Garlick v. Lee*, 1 F.4th 122, 134 n.5 & 134-36 (2d Cir. 2021) (state court's rationale for denying relief was unreasonable; de novo review applied); *Fuentes v. Griffin*, 829 F.3d 233, 249-52 (2d Cir. 2016) (same); *Henry v. Poole*, 409 F.3d 48, 71-72 (2d Cir. 2005) (same).

A decision is "contrary to" clearly established law (28 U.S.C. § 2254(d)(1)) if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court

---

[10] This memorandum occasionally refers to 28 U.S.C. § 2254 as AEDPA.

on a question of law." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Similarly, AEDPA does not bar relief, and de novo review of a federal claim is required, where the state court rejects a federal claim "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2),(e)(1).

**B. De novo review of the *Brady* claim is required.**

The 440 court's specific reasons for denying relief were objectively unreasonable, thus requiring review without deference. 28 U.S.C. § 2254(d)(1). *Wilson*, 138 S. Ct. at 1191-92.

First, the 440 court unreasonably relied on the theory that the Mejia DD5 report was inadmissible hearsay. *Id.* at 6-7. Contrary to the 440 court's reasoning, the *Brady* inquiry considers whether the suppressed evidence would have led to admissible evidence: here, Mejia's trial testimony. The admissibility of the documentary police report alone was irrelevant. The 440 court's "graft[ing] [of] an admissibility requirement onto *Brady*'s traditional three-pronged inquiry" was an unreasonable application of, and contrary to, clearly established Supreme Court precedent. *Dennis v. Sec'y, Pennsylvania Dep't of Corr.,* 834 F.3d 263, 307 (3d Cir. 2016); *Kyles*, 514 U.S. at 433 (inquiry focuses on whether the *disclosure* of evidence would have affected the verdict); *see also Hughbanks v. Hudson*, 2 F.4th 527, 540 (6th Cir. 2021); *Wearry*, 577 U.S. at 389 (suppression of hearsay within a hearsay police report violated *Brady*);

*Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003); *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).[11]

Second, in adopting the State's baseless suggestion that Mejia did not "see the shooting" but only saw a hoodie-wearing "Hispanic male holding a gun only after the shooting had transpired" (Ex. A: Decision 6-7), the 440 decision was, again, objectively unreasonable. 28 U.S.C. § 2254(d)(1),(2).

For starters, this theory defies the procedural history of this case. On the State's motion, the trial court had *vacated* and *dismissed* the codefendant's murder conviction *because of* Mejia's exculpatory account (A913d). Paradoxically, the State (Ex. D at 108, 111) and the trial judge then turned around and adopted the suggestion—in Petitioner's separate motion litigation—that Mejia didn't really see anything, so her statement is useless. Due process, and simple justice, precluded these inconsistent positions. *Smith v. Groose,* 205 F.3d 1045, 1052 (8th Cir. 2000) ("[T]he use of inherently factually contradictory theories violates the principles of due process."). And the fact that the court previously dismissed codefendant's murder conviction due to Mejia's statement confirms that the court's subsequent

---

[11] An unreasonable "admissibility" requirement would destroy *Brady*. Under this requirement, *any* out-of-court statements (reports, recordings, etc.) that are inadmissible hearsay—a large swath of *Brady* material—would be immune from *Brady*'s disclosure requirement. Under this proposal, prosecutors would have virtually no disclosure obligation as most exculpatory information is contained within inadmissible police reports or other hearsay documents. There is no logical reason for that radical dilution of the State's obligation to disclose favorable evidence.

determination here that Mejia did not actually see the shooter was simply unreasonable. 28 U.S.C. § 2254(d)(1),(2).

The record also conclusively refutes this unreasonable factual theory. 28 U.S.C. § 2254(d)(2). Mejia told Detective Mercado-Gomez, on the night of the shooting, that she "saw [the] shooter [who] was a tall dark-skinned male with a gray sweater and gray hoodie [and] heavy beard." A*i*. She later stated, to a private investigator, that she saw this hoodie-wearing shooter chase Juan Juarez with a gun in his hand and then saw him fleeing with a gun in his hand. A62-63, A67, A71. That record conclusively establishes that Mejia saw the *actual shooter*, not a random hoodie-wearing person who was coincidentally at the scene of a shooting with a gun. At a minimum, this record conclusively confirms a reasonable probability that, had Mejia testified, her testimony would have persuaded the jury that the person she saw that night—whose description did not match either codefendant—was the actual shooter. *Kyles*, 514 U.S. at 434.

Third, although Mr. Giles had argued that the suppression of Mejia's account was material because the confession was unreliable, the 440 court found this claim "contradicted by the Court's own finding after [a pretrial suppression] hearing that his statements were voluntarily made and also by his own most recent admissions in his affidavit in support of codefendant's 440 motion." Ex. B at 8 & 8 n.12. This was objectively unreasonable in two ways: (1) the operative question, as far as materiality goes, is not a pretrial court's assessment of "voluntariness" but a jury's likely assessment of the statement's reliability; and (2) a statement purportedly made years after trial—and never admitted into evidence at trial—is categorically irrelevant to

31

the *Brady*-materiality analysis. *E.g.*, *Kyles*, 419 U.S. at 435; *Harris v. Thompson*, 698 F.3d 609, 630-31 (7th Cir. 2012) (although voluntary, a confession may nevertheless lack probative value due to reliability problems) (citing *Crane v. Kentucky*, 476 U.S. 683, 691 (1986) ("evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility") *and Smith v. United States*, 348 U.S. 147, 153 (1954) ("[T]hough a statement may not be 'involuntary' . . . still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past."))[12]

In sum, the 440 decision "involved" numerous unreasonable applications of clearly established law and was "based on" unreasonable findings of fact. 28 U.S.C. § 2254(d)(1),(2). Accordingly, AEDPA deference does not apply to the *Brady* claim and it should be reviewed de novo.

## C. In any event, no fair-minded jurist could reject prejudice here.

Deference or not, relief is required because the 440 court unreasonably concluded that the fraudulent suppression of the Mejia DD5 was immaterial.

---

[12] Nor does this unethically obtained statement (obtained by co-defendant's counsel without notifying Petitioner's post-conviction counsel) even prove anything as it does not acknowledge Mr. Giles' involvement in the shooting. *See* Petitioner's 440 Motion Reply: Ex. D at 143 n.4 (citing New York Rules of Professional Conduct Rule 4.2(a)-(b)). Instead, the statement merely states that "[codefendant] was not involved in this crime"; codefendant was "not with me before, during or after the shooting"; codefendant was "not at the scene of the shooting and did not participate in it"; and "I was not a friend or acquaintance of [codefendant]." State's Supp. Appdx. in Opp. to 440 Motion at SA1-2.

### 1. Mejia's account was important to Mr. Giles' defense.

Mejia's account, hidden in a doctored police report, undermined the reliability and credibility of the State's most important witness: Marcos Nolasco. *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (when a "witness is central to the prosecution's case," the "suppressed impeachment evidence . . . takes on an even greater importance."). Mejia's account confirmed that Nolasco, who identified the codefendant as the hoodie wearing shooter, could not be trusted to make accurate identifications. Mejia's testimony would have cast the testimony of the State's most important witness in a completely "different light" as it would have squarely contradicted his testimony. *Kyles*, 514 U.S. at 435.

Further, Mejia's account established Nolasco's willingness to lie to curry favor with the prosecutor. Nolasco testified that when he first inculpated the codefendants, he "wanted a deal." A592. While that testimony allowed the defense to generally claim Nolasco was seeking a benefit—it did not affirmatively establish that Nolasco had lied to secure one. But Mejia's account proved that Nolasco had falsely accused codefendant of murder to secure a benefit. Had the jury learned that fact, it would have likely disregarded his entire testimony as unreliable. *See* Jury Charge: A788 ("If you find that any witness has intentionally testified falsely as to any material fact, you may disregard that witness's entire testimony. . . . "); *Bennett v. United States*, 797 A.2d 1251, 1255-56 (D.C. 2002) ("To lie to the police or to a grand jury about a murder is to pervert the course of justice with respect to the willful taking of a human life. If a witness is willing to lie about a murder, a jury may well conclude [he would]

lie about anything. [And if] he has lied about one murder, there may be little if any reason to credit her testimony about a different murder.").

The "likely damage" worked by the suppression of evidence undermining Nolasco's reliability is "best understood by taking the word of the prosecutor" (*Kyles*, 514 U.S. at 444), who relied heavily upon Nolasco's testimony in summation. Devoting more than ten pages of his summation to Nolasco (A735, A738, A749-58), the prosecutor pressed that Nolasco had a "front row seat" and emphasized that "the single *most important piece of evidence* at this trial" was that Nolasco had no reason to lie. A757-58. Nolasco's testimony "corroborated" the confession, the prosecutor stressed. A735, A738. Rounding off his argument, the prosecutor triumphantly declared, "[W]hen you appreciate that Marcos [Nolasco] had no motive to falsely implicate these two defendants, you're left with one obvious, one inescapable, and one logical conclusion. These two defendants did it." A758. This prosecutor's heavy reliance on Nolasco shows that evidence impeaching Nolasco would have been critically important to the defense.

The concealment of Mejia's account also hid important evidence of an incompetent police investigation. Although the lead detective knew of Mejia's account, and at least one member of the NYPD knew about Mejia's exculpatory yearbook, the NYPD never pursued the crucial Mejia lead. Upon learning of this investigatory malpractice, a reasonable juror would have developed sharp doubts about the investigation's

reliability.[13] Specifically, the Mejia evidence indicated that the lead detective here (Mercado-Gomez), who interrogated Mr. Giles, "essentially did nothing" upon learning of a critical lead, and then lied about it on the stand. *Mendez*, 303 F.3d at 416; Mercado-Gomez: A478 ("Q. In your interviews with the other witnesses to the crime, did you or any member of your team know the second shooter? A. No."). The disclosure of the Mejia statement would have destroyed Detective Mercado-Gomez' credibility, and the reliability of his interrogation along with it.

## 2. The weaknesses in the prosecution's case confirm the prejudice.

The weaknesses in the prosecution's case further establish a reasonable probability that the prosecutor's violations contributed to the verdict.

*First*, the prosecution introduced no forensic, surveillance, or physical evidence linking Mr. Giles to the offense.

*Second*, Lantigua and Rodriguez—the only other "eyewitnesses"—provided weak testimony. Lantigua failed to identify Mr. Giles in court. And before trial, he only identified Mr. Giles after an unreliable and suggestive lineup procedure. Lantigua: A226 *and* A233-34 (before the lineup, the police told Lantigua that the shooter would be in the lineup and Lantigua only identified Mr. Giles after a process of elimination).

---

[13] *Kyles,* 514 U.S. at 446 n. 15 (when "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it"); *Dennis*, 834 F.3d at 302; *Mendez v. Artuz*, 303 F.3d 411, 416 (2d Cir. 2002).

Rodriguez' testimony was even weaker. Rodriguez expressly testified that he could not identify the shooter because he was too far away. A339-347. Then, when asked if he lied to the grand jury, Rodriguez was vague and evasive: "I was nervous . . . there was a lot of things going on that day . . . I don't know. I don't know." A433.

Thus, as this was effectively a one-eyewitness case (Nolasco), there is a reasonable probability that Mejia's account, which bolstered Nolasco's reliability, affected the verdict. At a minimum, the Mejia evidence would have added a little more doubt to the jury's view of the' evidence. There is a reasonable probability a little more doubt would have been enough to sway one juror to acquit. *See Wiggins*, 539 U.S. at 537.

*Third*, the jury had reason to doubt Mr. Giles' unreliable statements. The confession was the result of an interrogation of a teenager (17) who was removed from his bedroom at 3 a.m. and locked in a tiny 8 x 5 room for hours.[14] It would have been particularly sensible for the jury to doubt the confession's reliability since the prosecutor offered no proof that Mr. Giles slept, ate, or drank anything throughout his lengthy isolation.

---

[14] Jury Instruction: A796-799 (instructing the jury that the prosecution bore the burden of proving voluntariness beyond a reasonable doubt); *Harris*, 698 F.3d at 630-31 ("[A] confession is not incontrovertible evidence of guilt. . . . Simply because a confession is in evidence does not make every violation of the accused's constitutional rights *ipso facto* a harmless error") (citing *Crane*, 476 U.S. at 689, 691 and *Smith*, 348 U.S. at 153); *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) ("[T]he pressure of custodial interrogation is so immense that it can induce a frighteningly high percentage of people to confess to crimes they never committed. That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile.").

The detective's failure to record this homicide interrogation and his barebones account of the initial interrogation also supported the "natural inference" that he engaged in coercive/suggestive conduct, *e.g.*, he contaminated the confession by feeding Mr. Giles details or promising leniency.[15] Indeed, there is uncontroverted evidence that the detective's account of the first interrogation is incomplete. During the second interrogation, Mr. Giles said he had previously told Detective Mercado-Gomez about "Boogz." State's Ex. 71: Video at 12:39. But Boogz was never referenced in the detective's testimony or written statement.

The detective's barebones account of the unrecorded interrogation raises additional doubts about the interrogation's reliability. When asked about the interrogation, he vaguely claimed: "[W]e basically [told] him why he's there . . . [That] we would like to find out, you know, what happened. Why did it take place. What did he do. Things like that." A463, A470. This vague testimony failed to provide meaningful assurance that the detective did not use coercive or suggestive tactics during the interrogation.

Indeed, the State's trial theory was that Mr. Giles was *not* telling the truth in his confession because "there never was a Boogz." Summation: A757. Thus, the State conceded to the jury that at least part of Mr. Giles' confession was false. While the prosecutor claimed that Mr. Giles invented "Boogz" to cover for an accomplice, *id.*, it

---

[15] *People v. Evans*, 141 A.D.3d 120, 125 (1st Dept. 2016) (the failure to record an interrogation "raises significant concerns") (quotation marks omitted); *State v. Perea*, 322 P.3d 624, 653 n.23 (2013) (when the police refuse to record an interrogation, the "natural inference" is that they have "attempted to hide some aspect" of it); *Commonwealth v. DiGiambattista,* 442 Mass. 423, 441 (2004) (same).

is equally plausible that he invented facts because he was falsely confessing to take the fall for someone else. *See also* Video 12:30 (Mr. Giles refused to answer the interrogator's question as to "where he got the gun," thus suggesting he was covering for someone); *id.* 12:36 (stating that he was "with a couple of [his] friends" but refusing to provide any names).

The jury also had a good reason to believe the officers contaminated Mr. Giles' statements: the video-taped statement contains new and curiously specific details the police learned earlier that morning after the initial interrogation. Video 12:29-12:30 (referencing, for the first time, four shots with a .380 caliber firearm); Video at 12:38-12:39 (referencing a second shooter for the first time). The undisputed fact that Mercado-Gomez personally wrote out a full confession, which he later got Mr. Giles to sign (an obviously unreliable procedure) further reinforced the likelihood of contamination.

* * *

In sum, the prosecutor's deceptive suppression of the Mejia account undermines confidence in the trial's outcome. The 440 court's decision to the contrary was unreasonable and contrary to clearly established Supreme Court law.

## POINT II

### The prosecutor's knowing misrepresentations violated *Napue* and its progeny.

The State's pattern of due-process violations did not stop with the fraudulent concealment of Mejia's account. Instead, the prosecutor also repeatedly and

knowingly lied to the jury. Those *Napue* violations, viewed individually or collectively, also require relief.

### A. *Napue* Standards

A prosecutor violates due process when he knowingly misrepresents the truth in summation or knowingly elicits false testimony. *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This basic rule is "'implicit in any concept of ordered liberty,'" and recognizes that "[t]he prosecutor is an officer of the court whose duty is. . . not to win at any cost." *Drake*, 553 F.3d at 240 (quoting *Napue*, 360 U.S. at 269); *Jenkins*, 294 F.3d at 296 n. 2.

"As to materiality, [petitioner] is entitled to a new trial 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' 'Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Fernandez v. Capra*, 916 F.3d 215, 230 (2d Cir. 2019) (citations omitted); *Drake* 553 F.3d at 241; *Shih Wei Su v. Filion*, 335 F.3d 119, 129 (2d Cir. 2003). "This 'strict standard of materiality' is appropriate 'not just because [such cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.'" *Drake*, 553 F.3d at 241 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)).

### B. The prosecutor repeatedly introduced false evidence.

The prosecutor's egregious pattern of dishonesty did not end with his *Brady* violations. The prosecutor also repeatedly and knowingly introduced false testimony and lied to the jury in summation:

- He elicited false testimony that the police never learned of a second suspect when canvassing the neighborhood—a claim undermined by the Mejia police report.[16]

- He repeatedly misrepresented the truth in summation by informing the jury that he had not suppressed any evidence and that his witnesses were consistent—claims that were squarely refuted by the suppressed Mejia report.[17]

- He knowingly lied in summation when he told the jury that the real reason Detective Mercado-Gomez did not record the interrogation was because the NYPD lacked a "working camera."[18] It is impossible that, in 2009, the largest police force in America lacked access to a "working camera" for a homicide interrogation.[19]

No doubt, these misrepresentations "could have" affected the verdict. *Fernandez*, 916 F.3d at 230. The State's elicitation of false testimony from Detective Mercado-Gomez about whether he had learned of any other suspects during his investigation

---

[16] *Compare* Detective Mercado-Gomez: A478 ("Q. In your interviews with the other witnesses to the crime, did you or any member of your team know the second shooter? A. No."); *with* Suppressed Police Report: A*i* (stating that Mejia said she "saw [the] shooter [who] was a tall dark skinned male with a gray sweater and gray hoody [and] heavy beard. Mercado-Gomez advised.").

[17] A748-49 (misrepresenting to the jury that he had upheld his duty to fairly administer justice and had not suppressed any evidence); A749 (misrepresenting that there were "no inconsistencies" in his eyewitnesses' accounts and then dishonestly declaring that if the jury "compare[d] [Nolasco's testimony] to every other piece of information in this case . . . [it] stands up. He is corroborated. He is accurate and he told you the truth.").

[18] A715 ("Here's the truth . . . the police did not have a working camera.").

[19] Mr. Giles raised the no-working-camera-*Napue* claim in the Appellate Division as an independent point for relief, but that Court did not address it. Ex. D at 241. This record indicates that the Appellate Division simply overlooked the claim presented here. Thus, there was no "adjudication on the merits" and AEDPA deference does not apply. 28 U.S.C. § 2254(d)(1); *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 279 (3d Cir. 2018). In any event, as this prosecutorial lie went to a critical issue at trial—the reliability of the confession—this *Napue* claim prevails even under deferential review.

plainly sharpened the prejudice" worked by his pretrial suppression of Mejia's account. *Jenkins v. Artuz*, 294 F.3d 284, 294-95 (2d Cir. 2002); A478. This deception hid Mejia's existence from the jury and covered up the reality that the police incompetently failed to follow up on a critical lead. *See Kyles*, 514 U.S. at 446 & 446 n. 15.

The prosecutor's misrepresentations regarding Nolasco's reliability in summation further prejudiced the defense. The prosecutor misrepresented that there were "no inconsistencies" in his eyewitnesses' accounts. A749. He then dishonestly declared that if the jury "compare[d] [Nolasco's testimony] to every other piece of information in this case . . . [it] stands up. He is corroborated. He is accurate and he told you the truth." A748-49 (emphasis added). These claims were false—and the prosecutor knew it. The prosecutor's strategy was to show the jury that his case, and particularly his central witness, Nolasco, was sturdy and uncontradicted. That false picture prejudiced the defense.

 The prosecutor's misrepresentation that he was personally upright and fair, and had not withheld any evidence from the defense, also prejudiced the defense. A748-49 (misrepresenting to the jury that he had upheld his duty to fairly administer justice and had not suppressed any evidence). This seasoned prosecutor knew the obvious: his "credibility before the jury" was "perhaps [his] most important asset."[20]

---

[20] Robertson, *Guilty As Photoshopped: An Examination of Recent Case Law and Scholarship Regarding the Use of Non-Probative Images in the Courtroom*, 55 Washburn L.J. 731, 738 (2016); *Berger v. United States*, 295 U.S. 78, 88 (1935) (explaining that jurors place considerable trust in a prosecutor).

By lying to the jury that he was an upright, *Brady*-complying prosecutor in pursuit of fairness and justice, the prosecutor painted himself—and his case—as trustworthy. That misrepresentation was prejudicial.

Finally, the prosecutor's lie in summation about the absence of a working camera demolished a key attack on the confession's reliability. A715. The defense's central argument was that Detective Mercado-Gomez intentionally declined to record the initial interrogation because he aimed to avoid creating a record of coercive and suggestive tactics. *E.g.*, Defense Summation: A667-69, A674. But the prosecutor demolished that carefully constructed argument by lying that the police lacked a "working camera." That misrepresentation confirmed that Detective Mercado-Gomez had not chosen to avoid recording his interrogation tactics—he simply lacked recording equipment. A715. Even worse, it was only *after* defense counsel developed the failure-to-record defense during Detective-Mercado-Gomez' cross and the defense summation that the prosecutor sprung this lie on the jury in summation. That was unfair.

Viewed individually or collectively, the State's repeated *Napue* violations "might have affected" the verdict. *Kyles*, 514 U.S. at 436; *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008). Indeed, when the "government knowingly permit[s] the introduction of false testimony[,] reversal is 'virtually automatic.'" *Fernandez*, 916 F.3d at 230; *Drake* 553 F.3d at 241; *Shih Wei Su*, 335 F.3d at 129.

## POINT III

**The trial court violated the duty of neutrality when it threatened a State witness with a perjury indictment if he did not change his testimony and accuse Mr. Giles of murder.**

### A. Overview

With crystal-clear language, the trial court threatened Carlos Rodriguez that if he failed to change his testimony to conform to the prosecution's case, he would be indicted for perjury. *See* A347-48, A360. This egregious intervention into the trial process not only indicated a risk of actual bias, but it confirmed actual bias. The judge picked sides and sought to ensure that his chosen side won. In doing so, the judge abandoned his role as a neutral arbiter and instead tried to mold the testimony to support the State's case.

In answering Petitioner's judicial-bias claim in the Appellate Division, the State pressed a factual theory: the trial judge did not explicitly threaten Rodriguez with perjury if he did not change his testimony and identify Mr. Giles as the shooter. Instead, the theory went, the judge merely (and innocuously) told the witness to "tell the truth" and provided general warnings about perjury's "consequences." State's App. Div. Brief: Ex. D at 278-79. The Appellate Division adopted the State's view of the facts, holding that the judge merely "warned an uncooperative witness, whose trial testimony contradicted his grand jury testimony, that he could be prosecuted for perjury. The court identified the conflict in the witness's sworn statements, directed him to tell the truth, and correctly stated the possible legal consequences involved." Ex. A at 2.

43

This Court should now correct the state's court's unreasonable factual determination and grant relief on judicial-bias grounds. 28 U.S.C. § 2254(d)(2).

**B. De novo review applies.**

The Appellate Division made an unreasonable factual finding that the trial court did not threaten Rodriguez with perjury charges if he failed to modify his testimony to confirm to his grand jury testimony. 28 U.S.C. § 2254(d)(2) (an unreasonable finding of fact overcomes AEDPA deference), § 2254(e)(1) (Petitioner must show, by clear and convincing evidence, that the state court's factual determination was incorrect); *Kernan v. Hinojosa*, 578 U.S. 412, 413 (2016) (per curiam) (de novo review applies where the state-court decision rests on an unreasonable factual determination).

The trial court's threat here was clear as day. After Rodriguez testified that he could not identify the shooter because he was too far away from the scene, the court stated that it was "satisfied that [Rodriguez] not testifying truthfully" and was "feigning" a lack of memory. A348. The court told Rodriguez that it would assign him counsel, who would advise him of the "consequences of lying under oath, that being a perjury indictment, as well as the possibility of civil contempt." A348. The court then explicitly threatened Rodriguez that "in the event that *you maintain the position that you've maintained*, you will face the consequences that I've just suggested." A348. Moments later, the court reinforced the threat: "[I]f your testimony *does not change* with respect to the material issues that you've testified to that are so completely contradicted by your prior statements, you *will be subject to a perjury indictment* and an arrest and prosecution for the crime of perjury." A360. The court then stated, "in

my judgment, what you have done thus far satisfies the elements of the crime of perjury, and therefore, it is a real possibility that you will be arrested and charged on that crime if this *persists*." A360.

The record unequivocally proves that the court did not merely, as the Appellate Division held, "warn" Rodriguez "that he could be prosecuted for perjury" and "direct him to tell the truth." Ex. A at 2. Instead, as Petitioner expressly argued before the Appellate Division, the court conditioned Rodriguez' liberty on his providing *particular* testimony, that is, testimony accusing Mr. Giles of murder. *See* A348, A360; Ex. D at 230-32, 321-24. If Rodriguez repeated his grand jury testimony before the trial jury, he would avoid a perjury indictment. But if he stuck with his trial testimony and testified he could not make out the shooter because he was too far away, he would be indicted for perjury. *Id.*

As clear and convincing evidence confirms that the Appellate Division's factual finding here was incorrect and unreasonable, AEDPA deference is overcome and de novo review of this due-process claim is required. 28 U.S.C. § 2254(d)(2),(e)(1).[21]

---

[21] The Appellate Division stated a "factual predicate" for procedural default, *see* Ex. A at 2 ("without objection and outside the jury's presence, [the court engaged Rodriguez about his testimony]), but never found this constitutional claim unpreserved. *Jones v. Stinson*, 229 F.3d 112, 118 (2000). Indeed, Petitioner had argued that this claim was immune from preservation requirements, a point the State did not deny. Ex. D at 233-34, 326. Accordingly, there is no independent state procedural bar to merits review here. *Jones*, 229 F.3d at 118 (where the "appellate division set forth the factual predicate for a finding of procedural default [but] never actually stated that the issue was not preserved," there was no procedural default) (citing *Harris v. Reed*, 489 U.S. 255, 266 (1989)).

### C. This judicial threat confirmed bias or, at a minimum, an unacceptable risk of bias.

The accused has a fundamental due-process right to an impartial judge. *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017); U.S. Const. Amend. 14. To show a violation of this right, a petitioner need not establish actual bias. Instead, the test is whether "objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo*, 137 S. Ct. at 907 (quoting *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)); *Williams v. Pennsylvania,* 579 U.S. 1, 8 (2016) ("The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias"). A judge cannot preside over a trial if "burdened by any 'possible temptation . . . not to hold the balance nice, clear and true between the State and the accused.'" *Williams*, 579 U.S. at 16 (quoting *Tumey v. Ohio*, 273 U. S. 510, 532 (1927)).

This fundamental neutrality requirement guarantees that the judge does not have a "distorted conception of the facts or the law." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Equally important, the requirement "preserves both the appearance and reality of fairness." *Id.* "Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams*, 579 U.S. at 16.

The Supreme Court has "jealously guarded" this neutrality mandate. *Marshall*, 446 U.S. at 242. A judicial-bias violation infects the entire trial process and is thus structural error, immune from harmless-error analysis. *Weaver v. Massachusetts*, 137

S. Ct. 1899, 1911 (2017) (citing *Tumey*, 273 U.S. at 535); *Chapman v. California*, 386 U.S. 18, 23 & 23 n.8 (1967); *Wallace v. Bell*, 387 F.Supp.2d 728, 738 (E.D. Mich. 2005); *Maurino v. Johnson*, 210 F.3d 638, 645 (6th Cir. 2000).

As the New York Court of Appeals recently and persuasively held in *People v. Towns*,[22] a trial judge violates the fundamental neutrality requirement when he personally brokers a cooperation agreement with a witness, thus "effectively procur[ing] a witness in support of the prosecution." 33 N.Y.3d 326, 332 (2019); *see also id.* at 328-29 (trial judge offered codefendant a reduced sentence in exchange for truthful testimony against the defendant). "Significantly," the Court held, "by tying its assessment of the truthfulness of the codefendant's testimony to [his] prior statements to police, the [judge] essentially directed the codefendant on how [he] must testify in order to receive the benefit of the bargain." *Id.* at 332-33. By "assuming the function of an interested party and deviating from its own role as a neutral arbiter," the court violated the "due process right to a 'fair trial in a fair tribunal.'" *Id.* at 333 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

Here, the trial court's egregious effort to create evidence for the State—through an explicit perjury threat—demonstrated not just apparent bias, but actual bias. The judge determined that a State witness' trial testimony (Rodriguez), which did not help the State, was not true. The judge then threatened him with a felony perjury

---

[22] As this Court must review the legal merits of this due process claim de novo given the state court's unreasonable factual finding (without requiring an unreasonable application of clearly established Supreme Court law), New York Court of Appeals precedent is relevant persuasive authority here.

indictment and contempt if he did not "change" his testimony and accuse Mr. Giles of murder. A347-48, A361; *Towns*, 33 N.Y.3d at 332-33. This extreme judicial intervention displayed an obvious desire to help the prosecution develop its case against Mr. Giles. By picking sides—the State's side—the judge abandoned his role as a neutral arbiter. No reasonable person could discern anything but actual bias here. *Marshall*, 446 U.S. at 242. The trial judge was not merely "burdened by" a "temptation" not to "hold the balance nice, clear and true." *Williams*, 579 U.S. at 16. Instead, the judge specifically acted on that temptation by aiding the State in its desire to resurrect secret (and unconfronted) Grand Jury testimony that a witness did not repeat during face-to-face confrontation at trial. *See Coy v. Iowa*, 487 U.S. 1012, 1020 (face-to-face confrontation "may confound and undo the false accuser").

The bias here was worse than it was in prior Supreme Court cases. In those cases, the judges had a particular interest that created the *risk* of favoritism. *E.g.*, *Caperton v. Massey*, 556 U.S. 868 (2009) (campaign contributions to appellate judge). Here though, the record confirms actual bias against the defense—a bias so strong that it induced the judge to manufacture evidence in support of the State's cause.

The court's coordination of its efforts with the State further revealed the bias. Before Rodriguez testified at trial, the State specifically told the court that Rodriguez had recanted but that it was going to call him to the stand anyway. A327-32. Then, when Rodriguez' testimony did not pan out the way the prosecution wanted, the court intervened to save Rodriguez' testimony for the prosecution by threatening him with perjury and contempt charges. A347-48, A360. Threatening a witness with a perjury indictment if he does not change his testimony to conform to the prosecution's case

proves bias. But it does so even more when the threat is delivered to get the State out of a jam of its own making.

This violation of the neutrality duty was far more egregious than the violation in the New York Court of Appeals' decision in *Towns*. There, the biased judge provided the witness with a roadmap to avoid prison time. 33 N.Y.3d at 332-33 (judge told the witness that the truthfulness of his testimony, and thus his securing a sentencing benefit under a cooperation agreement, would hinge on a comparison of his trial testimony and pretrial statements to police). Here though, the court expressly threatened a witness with a felony conviction and contempt unless he offered damaging testimony against the accused. A359-60.

Although it does not matter whether the court's biased intervention succeeded, this effort did. After the perjury threat, Rodriguez testified that his grand jury testimony identifying Mr. Giles was accurate, thus paving the way for the admission of Rodriguez' grand jury testimony.

\* \* \*

In our adversarial system, the State faces off against the defendant. Here though, Petitioner had to grapple with two adversaries—a prosecutor and a biased trial judge who threatened a witness in order to secure inculpatory testimony. This clear pro-State bias violated the basic due-process right to a neutral judge.

## POINT IV

### The prosecutor's misconduct during summation deprived Mr. Giles of a fair trial.

"The 'clearly established Federal law' relevant here is our decision in *Darden v. Wainwright*, which explained that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1985)). If the prosecutor's summation here did not violate due process, it is hard to imagine what would. The Appellate Division's rejection of this claim was an unreasonable application of, and contrary to, clearly established law. 28 U.S.C. § 2254(d)(1).

### A. The prosecutor repeatedly testified to facts not in evidence.

The prosecutor repeatedly testified to facts not in evidence. *Darden*, 477 U.S. at 182; *Berger v. United States*, 295 U.S. 78, 88 (1935) ("It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."). The prosecutor unfairly demolished the defense's carefully constructed failure-to-record argument—advanced throughout the entire trial—by turning himself into a witness.[23] "Here's the truth," the prosecutor exclaimed, "the police did

---

[23] Defense Opening: A126-27; Mercado-Gomez: A449, A473, A501-07, A513, A518, A524-29, A540-44; Defense Summation: A667-69, A674.

not have a working camera."[24]

This was knowing misconduct. The prosecutor knew there was no evidence at trial that the police lacked a working camera. Indeed, he began his summation testimony by stating, "Here's the truth," thus signaling he knew he was personally testifying. The prosecutor even employed the notorious "withdrawn" tactic, whereby an attorney intentionally violates legal rules and then withdraws the comment, thus ensuring that the objectionable matter goes to the jury. Even worse, as shown above, the prosecutor's testimony here about the absence of a working camera was *false*. *See* Pet. Memo. of Law, *above*, at p. 39-40.

The prosecutor compounded this due process violation by subsequently "misstat[ing] the evidence." *Darden*, 477 U.S. at 181-82. After testifying there was no working camera, the prosecutor claimed there was "no evidence" of a working camera. A716. But there was ironclad evidence: (1) it was 2009, by then recording technology and smart phones were ubiquitous; (2) the NYPD is the largest police force in America; certainly it could locate a recording device for a homicide investigation; and (3) the lead detective who interrogated Mr. Giles was repeatedly questioned about

---

[24] A715-16; Defense Summation: A667-69; *see also* Defense Summation: A674 (telling the jury that in the prosecutor's summation, "you still you still will not be provided with the reason as to why the police department in New York City doesn't videotape or audiotape their interrogations"); Defense Opening: A126-27 ("You're not going to hear any audio recording of what was said to Daikwan or . . . if any promises were made to him or what he was told by the police officers who were investigating the case. . . . And I would find it fascinating if someone came in here and told you that the [NYPD] in 2009 didn't have access to a video recorder or an audio recorder . . . I find that fascinating."); Mercado-Gomez: A449, A473, A501-97, A507, A513, A518, A524-25, A529-30, A540-44.

this matter and never even hinted that he lacked a working camera.

Compounding the prejudice, the prosecutor paradoxically called defense counsel a liar because counsel's failure-to-record defense (which was based on the trial evidence) conflicted with the prosecutor's extra-record summation testimony. A716-17; *Young*, 470 U.S. at 9-10 (prosecutor cannot make "unfounded and inflammatory attacks on the opposing advocate"). To launch that attack, the prosecutor led the jurors astray with a parable about his own past of stealing baseball cards and his grandfather who stormed the beaches of Normandy. A716-17. After that story ended, the prosecutor stated: "[the] irony of this situation w[h]ere these false statements of fact that are relied upon in arguments is that Mr. Demarco finds himself in the same situation as his client." A717. This prejudicial attack on counsel was impermissible as it was bizarre.

The prosecutor's efforts to turn himself into a witness did not stop with the failure-to-record issue. The prosecutor also offered his own testimony regarding another important issue: Nolasco's credibility. To rebut the defense's claim that Nolasco was testifying in exchange for a deal, the prosecutor testified that he does not personally offer deals to witnesses accused of misdemeanors. A752. This extra-record testimony bolstered Nolasco's credibility because it undermined the defense's benefit argument. Indeed, Nolasco received very-lenient treatment (community service and no jail time) even though his 2009 rooftop arrest was his "sixth or seventh" misdemeanor and he failed to complete his community-service sentence. A593-94, A611, A618-19, A628-29. There was thus a valid argument that Nolasco had in fact received lenient treatment in exchange for his trial testimony. Without the prosecutor's extra-record

testimony, the only evidence that Nolasco had not received a benefit in exchange for his testimony came from Nolasco's testimony, which was far-more unreliable than the trusted word of a prosecutor. *Berger*, 295 U.S. at 88.

Ironically, the prosecutor prefaced his testimony on this issue with the claim that he was "settling" this issue "in a way that's fair to everyone." A752. It was hardly fair for the prosecutor to bolster his case by turning himself into an unsworn witness.

The prosecutor further suggested to the jury that although someone named Duane Estevez never testified, he would have provided valuable testimony: "I can't get up here and tell you what I did and why I did it. The law doesn't let me. I can't tell you what efforts I made to get Duane Estevez from the DR [Dominican Republic]." A708. This commentary suggested that the prosecutor tried to locate Estevez because he would have provided inculpatory testimony. Yet again, the prosecutor knew he was breaking the rules, as he expressly mentioned that the "law doesn't let me . . . tell you what efforts I made." A708. The prosecutor ignored the very law that he cited to the jury.

Lastly, the prosecutor referenced threats even though there was no evidence of any threats to witnesses at all. A741, A746 (suggesting that Rodriguez did not cooperate because he feared retaliation for being a "snitch[ ]"); A751. This baseless claim that witnesses had been threatened by Mr. Giles was gravely prejudicial.

### B. The prosecutor injected sympathy, safe-streets arguments, and other prejudicial commentary into this case.

Throughout his summation, the prosecutor emphasized that this case was about "the street" and "real crime." A701, A741. These arguments unfairly instructed the

jury to convict to keep the "streets" of the Bronx safe from "real crime." *See Darden*, 477 U.S. at 180; *Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Under *Young*, a prosecutor may not suggest that jurors should vote to convict a defendant lest that defendant endanger their neighborhood.") (citing *Young*, 470 U.S. at 18 (improper "pressure" to convict is impermissible)). The prosecutor reinforced that prejudicial point by telling the jury that they, the "People of the Bronx," should "do justice" and hold the defendants—who had "announced to the world that they were men"— "responsible." A760; *Young*, 470 U.S. at 18 (error to implore jury to "do its job"). This argument had nothing to do with the facts and everything to do with convincing the jury to send a message and protect the community.

Continuing to distract the jury from the evidence, the prosecutor summoned sympathy: "Juan Jerez has been in a box in the ground for four years and will never see his mother again . . . I've been carrying this case, the death of a 15-year-old boy for four years, and when I sit down, I'm giving Juan Juarez to you." A708, A760; *Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999) ("This court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision.").

The prosecutor also looped his discussion of the victim's family into a harsh attack on Mr. Giles' family: "I'm glad there is family in court to support the defendants at this trial. I wish there was family involved back on June 12, 2009." A708. These harsh attacks further moved the jury's attention away from the facts and onto emotion.

The prosecutor next unfairly equated a legitimate defense—that the lead detective's failure to recall critical details undermined his credibility—with an effort

to secure a "free pass on a murder." A704; *see* Mercado-Gomez: A444-47, A450-51, A463, A470, A481-82, A487, *and* A509 (Detective Mercado-Gomez failed to recall numerous important facts, repeatedly referred to his notes, and supplied a barebones account of the initial interrogation). The defense's argument was simply an effort to hold the prosecution to its burden of proof. By attacking that legitimate defense position as an effort to "get a free pass on murder," the prosecutor effectively punished Mr. Giles for challenging a witness' credibility. *Darden*, 477 U.S. at 182 (prosecutor's comments in summation cannot "implicate other specific rights of the accused").

## C. The prosecutor injected his own integrity and commitment into the jury's deliberations.

The prosecutor emphasized his devotion to this case, telling the jury that "[t]his morning I saw the sun rise from my office. I've been waiting years to give this summation . . . ." A701. The prosecutor similarly turned this case into a referendum on his own integrity, telling the jury—after "step[ping] back from the evidence"—to "judge" him. A708-09. Knowing full well that his credibility before the jury was a critical asset, the prosecutor unfairly relied upon the prestige of his position to convict. *Berger*, 295 U.S. at 88-89.

## D. This rampant misconduct deprived Mr. Giles of a fair trial.

The Appellate Division unreasonably held that the prosecutor's rampant misconduct here did not deprive Mr. Giles of a fair trial. Ex. A at 2. The jury could not possibly have fairly analyzed the evidence after this barrage of misconduct, especially given that a substantial amount of the misconduct *created* new evidence (the prosecutor repeatedly testified to facts not in evidence) and went directly to

critical issues in the case (*e.g.*, the confession's reliability and Nolasco's credibility). *Compare Darden*, 477 U.S. at 181-82 (finding no due process violation where the misconduct did not bear on the quality or quantity of the evidence). The court's repeated overruling of counsel's objections further enhanced the possibility of prejudice. *See Joseph v. Kirkpatrick*, 2021 WL 4931947, *2 (2d Cir. Oct. 22, 2021).

The State's case was certainly not strong enough to render this barrage of misconduct insufficiently prejudicial. The State's case amounted to an unreliable confession and a shaky witness (Nolasco)—two dubious pieces of evidence whose reliability was specifically enhanced by the State's misconduct in summation, including repeated references to extra-record "evidence."

The Appellate Division also unreasonably held that the "challenged portions" of the summation (discussed above) "generally constituted fair comment on the evidence" or "reasonable inferences to be drawn therefrom." Ex. A at 2. None of these comments were "fair comments" or based on "reasonable inferences." Indeed, the prosecutor's repeated reference to extra-record "facts," character attacks, and sympathy appeals are, by definition, "unfair comment[s] on the evidence."

The Appellate Division also unreasonably applied *Young* (470 U.S. 1 (1985)) in holding that the prosecutor's statements were "permissible responses to defense arguments" (the Appellate Division never stated which arguments the prosecutor was responding to). A1-2. On the contrary, *Young* held that the fact that defense counsel may have engaged in impermissible conduct in summation does *not* authorize a prosecutor to do the same under a petty "two-wrongs-make-a-right" theory. 470 U.S. at 12-13; *see also Plymail v. Mirandy*, 8 F.4th 308, 319-20 (4th Cir. 2021). It is not

"permissible," as the Appellate Division suggested, to engage in misconduct because a defense lawyer may have done something objectionable. Instead, the prosecutor's remedy was to object to comments he found objectionable. *Young*, 470 U.S. at 12-13 ("[T]he prosecutor . . . should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury."); *Plymail*, 8 F.4th at 319-20. The Appellate Division's holding to the contrary was an unreasonable application of, and was contrary to, *Young*.[25]

\* \* \*

This Court should issue the writ on the grounds that the prosecutor violated due process in summation.

## POINT V

### The prejudicial effect of the due-process violations should be analyzed collectively.

The *Brady*, *Napue*, prejudicial-summation, and judicial-bias violations (*see* Points I-IV) individually render this conviction unconstitutional. Alternatively, this Court should analyze these due-process violations collectively. *See* Pet. Mot. to Vacate: Ex. D at 63-67 (requesting that the court view the prejudice worked by the prosecutor's due-process violations collectively); *Reis-Campos v. Biter*, 832 F.3d 968, 977 (9th Cir.

---

[25] To be sure, a court may, in assessing whether the summation rendered the trial unfair, consider that the prosecutor was "responding" to defense counsel's summation to "right the scale." *Young*, 470 U.S. at 12-13. But the prosecutor's endless barrage of violations here were neither "responsive nor proportional to the defense counsel's comments." *Plymail*, 8 F.4th at 320. Any suggestion to the contrary would also be unreasonable.

2016); *Hein v. Sullivan*, 601 F.3d 897, 905 (9th Cir. 2010). As these violations collectively undermine confidence in the trial's outcome and render it fundamentally unfair, the writ should issue.

**POINT VI**

**At a minimum, a hearing should be ordered.**

To the extent there are any issues of material fact, this Court should order a hearing. *Fulton v. Graham*, 802 F.3d 257, 266 (2d Cir. 2015); 28 U.S.C § 2254(e)(2).

**CONCLUSION**

The writ of habeas corpus should issue. At a minimum, this Court should hold an evidentiary hearing.

Respectfully Submitted,

Robert S. Dean
Center for Appellate Litigation
*Attorney for Petitioner*

BY: /s/ Matthew Bova

Matthew Bova, *Of Counsel*
mbova@cfal.org

July 7, 2022